## WILLIAM WEST *vs.* ANDREW FLANNAGAN.

A tenant constructed certain marine railways at heavy expense upon the leased premises, and, as he alleged, "with the knowledge, approbation and acquiescence, and by the implied leave and license" of his landlord, which he would not have made if he had supposed there was any probability of their removal while fit for use; and that the landlord well knew he never would have incurred the expense of their construction, but upon the faith that he should be permitted to use them as long as they were fit for use. The tenant held under a lease from *year to year*, and repeatedly requested his landlord to give him a more permanent lease, who as often refused, and afterwards gave notice to his tenant to quit. HELD:

That from these facts, there are no equities entitling the tenant to an injunction restraining the landlord from proceeding to gain possession of the premises.

Implied contracts are only sustained in order to supply the place of express agreements, and the latter never yield to the former unless by the express or implied understanding of the parties that such shall be the result.

West vs. Flannagan.

An express agreement admitted to be in full force, negatives an implied inconsistent agreement relating to the same subject matter.

The lease from year to year being established and recognised by both parties, they are in law supposed to know the nature and incidents of such a tenancy.

The improvements made in this case by the tenant and permitted and sanctioned by the landlord, are in perfect consistency with the terms of a tenancy from year to year, and the tenant must be presumed to have acted under this lease with his eyes open to the rights and powers it conferred both upon himself and the landlord.

The knowledge, approbation and acquiescence, and the implied leave and license of the landlord for these improvements, could no more enlarge the rights of the tenant under the lease than an opposite course could have curtailed them.

The force of an answer responsive to the bill can only be avoided by the contradictory testimony of two witnesses, or of one supported by pregnant circumstances.

APPEAL from the Equity Side of the Superior Court for Baltimore city.

The bill in this case was filed by the appellee, on the 4th of March 1852, and alleges that complainant and one Trimble were partners in the business of making and repairing vessels, under the firm of Flannagan and Trimble, which began on the 1st of January 1843 and ended by the death of Trimble, on the 6th of August 1850, leaving complainant, as survivor, in possession of the partnership property; that this partnership was the successor of a previous one for the same business of Goodwin & Co., of which complainant was also a partner, and which was dissolved on the 1st of January 1843, and its effects, including the railway afterwards mentioned, assigned to Flannagan and Trimble. That in 1842, Goodwin & Co. constructed and owned a marine railway for hauling vessels out of the water to be repaired, and Flannagan and Trimble, in 1846, constructed and owned another such railway, the title and possession to both of which is now in complainant; that these railways are inclined plains, made partly on the shore and partly in and under the water of the harbor of Baltimore, into which they pass by a gentle grade, so as to facilitate the hauling up of vessels by machinery; that they

are necessarily made strong to bear the heavy weight on them, and are supported by piles driven deep in the bottom of the harbor, and cut off at varying depths under the water to give the necessary inclination to the ways, and from the character of the work, requiring great precision and skill in constructing the parts under water, and some of them to the depth of eighteen or nineteen feet, the expense of making them was $16,000 or thereabouts; that the length of one is about three hundred and eighty feet, of which one hundred and eighty are under water, of the other four hundred and twenty feet, of which two hundred and twenty are under water; that they are constructed of wood and iron, and calculated, with inconsiderable repairs, to last for twenty years or thereabouts, and required twelve months to construct them; that their chief expense was for labor, and all the materials now capable of being taken away and put to other uses would not bring more than $2000, if as much.

The bill further alleges, that the wharf on which said railways are constructed belongs to West, the appellant, who is owner in fee of all the lots on which they are made except three, which belong to Flannagan and Trimble; that said lots have been rented from year to year by Flannagan and Trimble, both prior and since the construction of said railways, at a rent therein stated. That the construction of said railways took place with the knowledge and approbation and acquiescence, and by the implied leave and license thereby of the said West, whose office was hard by all the time, who was frequently present during their construction, furnished the materials for the machine to cut the piles, and expressed his approval of the manner in which the work was done; that they would not have been made if the parties making them had supposed there was any probability of their removal whilst fit for use, and that West, during their construction, never gave their makers any reason to suppose that they would be so removed; that the rent was a fair one; that to obviate any difficulty, complainant has offered West to take a lease for ninety-nine years renewable forever, at a rent, or to

buy the lots at a price, to be fixed by three disinterested witnesses, which West has as often refused; and that the assertion and exercise by West of any right to resume, at this time, possession of said lots, and compel complainant to break up his railways, will operate as a fraud on him.

The bill then avers that West has given complainant notice to quit, and has had a warrant of forcible detainer served upon him to turn him out of possession. That under the circumstances before stated, he has obtained a right of property in said structures on West's lots, and the right to continue and use them while they last, subject only to the payment of a reasonable rent, which he admits may be raised from time to time as the lots appreciate in value; that it is against equity that West, without any complaint as to the rent now paid, should resume possession and compel complainant to break up his railways at a ruinous sacrifice, when he well knew that those concerned would never have made them except upon the faith that they would be permitted to use them so long as they were fit for use; and complainant offers to pay such advanced rent for the lots as shall, upon legal evidence produced for that purpose in this cause, appear just.

The bill then prays for a decree that complainant is entitled to maintain and use the said railways so long as they last, subject to the payment of the present rent, or such other rent as the court shall deem equitable, and for an injunction to restrain West from prosecuting further his warrant of detainer, or otherwise disturbing complainant's possession or use of said railways while they last and the rents therefor are duly paid. The injunction was granted as prayed.

The *answer* of the appellant admits the partnership of Flannagan and Trimble, and its successorship to Goodwin & Co., which latter firm commenced in 1830, and about the year 1842, constructed a marine railway, which was immediately preceded by one built on the same site and used for the same purpose as far back as 1835; that Flannagan and Trimble, in 1846, built another alongside of that of 1842,

which has since been used by them for the purposes of such a structure, and that both are now in possession of complainant, and the title to them is in him so far as to authorise him to remove them on quitting respondent's property on which they are used. It also admits the manner of their construction as charged in the bill, but as to their cost he knows nothing, except that complainant, in 1850, told him that up to that time they had cost about $12,000. It avers that by repairs which a careful man might make, renewing the decayed or broken parts at once, they might be indefinitely continued, and certainly for a much longer period than twenty years. Respondent admits that he is owner of the wharf on which said railways are built and of all the lots over which they are made except three, as charged in the bill, but avers that they also extend over two streets dedicated to public use and liable to be opened at any time, which streets existed as they do now when the railways were built. He admits that these lots were rented of him from year to year by Flannagan and Trimble, and Goodwin & Co., before the railways of 1842 and 1846 were built, and that when the latter firm so rented them in the year ———, there was then erected and in use the earliest railway which preceded that of 1842, and he refers to an agreement to rent for one year during the existence of the earliest railway, containing stipulations for the removal thereof, to show that the cost and other matters relied on in the bill, as to those of 1842 and 1846, were not available to give any privileges beyond those ordinarily enjoyed by tenants from year to year, but rather the contrary. As to the allegation as to the sufficiency of the rent he further avers, that before the building of the railway of 1846, complainant applied to him for a permanent lease at an increased rent, which lease he always refused to give, declaring to complainant that he would not put the lots beyond his control, and that if complainant put and kept railways on them, it was at the risk of being removed when he wanted to improve them, at the same time assuring the complainant, that so long as the lots were rented for a ship yard, he would give him the preference.

That having determined so to improve the lots, he has instituted proceedings for their recovery, as stated in the bill; that he has built on property hard by, six three-story brick warehouses, and has foundations of others prepared, the use of which, when completed, will be materially interfered with by the use of said lots as a ship-yard, and that he will never permit them to be so used if he can prevent it. He admits that he knew of the *fact* of the construction of these railways, but does not admit that even if he had disapproved of it, it would have been competent to him to object to any use complainant or his predecessors thought proper to make of the property during their tenancy from year to year; nor if competent, was there any obligation on him to make the objection, in order to protect his rights as landlord, the tenant holding under a title as well known to himself as to the landlord; and denies that by not objecting to their construction he in any way prejudiced his rights as landlord. He explicitly denies that any contract, obligation, leave or license was ever given or intended to be given, either expressly or by implication, to complainant or his predecessors or any of them, for any other use or occupation of said lots than as tenants from year to year, liable to be removed on due legal notice. And he insists that any such right, leave or license to use and occupy his land, as claimed in the bill, is such an interest in land as could not pass except by writing, as required by the statute of frauds, of which he claims the benefit, as if pleaded.

The answer also denies the allegation, that the railways would not have been erected if the parties making them had supposed there was any probability of their removal while fit for use, as they were erected in the very face of his refusal to give a lease for years of said lots, or to rent them except from year to year, the first railway being made under an agreement for a yearly renting that required its removal at the end of the year, and the last in the face of his refusal to give more than a tenancy from year to year. He denies that the rent now paid is a fair rent, except as for a tenant from

6    v.4

year to year, liable to removal on due notice.   He admits that complainant has offered to take a lease for ninety-nine years or to buy the property, as stated in the bill, and that he has refused said offer which was made to him several times, and amongst others before the erection of the last railway, and always refused, as he had the right to do.   He also denies that the court has any right to fix and determine what is a proper rent now or hereafter to be paid for the use of his property.

After the filing of the answer there was a motion for the dissolution of the injunction, and testimony taken, to be considered on the hearing thereof.   On the part of the complainant, John Brown proves a conversation between the parties, in 1845, in which Flannagan said to West, "see what I am spending on your ground," to which West replied, "spend on, sir, you shan't be disturbed, and every thing shall be settled in an amicable way or to your satisfaction;" and also stated twice if not thrice for Flannagan to spend on, that all should be right.   Other witnesses proved the cost and value of the railways, as charged in the bill.   Samuel Kirby, examined on the part of defendant to prove Flannagan's admissions, on cross-examination proved, that in these conversations, Flannagan said West told him he should not be disturbed, and that having asked Flannagan if, under the same circumstances, he would put valuable improvements on a lot having but twelve months time in it? his reply was, that under the same assurances from the same man he would. Wesley Farrell proved, that in a conversation between the parties, in 1845, West said Flannagan "would have to confide in him."   Langly B. Cully proves that West said to Mr. Goodwin, "put what improvements you please on this property, I shall charge you in proportion thereto."   On the part of the defendant it was proved, that the railways were located over streets, as charged in the answer; that West repeatedly refused to give a lease for more than a year, and that the railways did injury to his other property, and that by constantly renewing the defective parts, they might be kept fit for use for an indefinite time.

By consent of parties, a *pro forma* decree was passed continuing the injunction till the final hearing, from which the defendant appealed.

The cause was argued before LE GRAND, C. J., ECCLESTON and MASON, J.

*John H. B. Latrobe* for the appellant.

The object of the bill is to obtain the specific performance of an alleged agreement. The injunction is ancillary, and unless a case is shown by the bill which would, upon final hearing, authorise the specific performance of the contract, it will be dissolved. 4 *Gill,* 477, *Geiger vs. Green.* 2 *Md. Ch. Decisions,* 534. The complainant must recover upon the case made by the bill. 4 *G. & J.,* 437. 2 *Md. Ch. Decisions,* 537. Now what is the case made by the bill? The complainant is a tenant from year to year,—the bill starts with this allegation—and this excludes the idea of any other contract than that resulting from such tenancy. The bill alleges, that the railways were built with the knowledge of the defendant, and his implied leave, acquiescence, &c., and that they would not have been built if those making them supposed they would be removed, and that defendant never gave them reason to suppose he would require them to be removed, and asks that complainant may be permitted to use them as long as they last, and that the court shall hear testimony of what the rents shall be. The complainant knew he was but a tenant from year to year, and yet he asks that these railways may be contined, and that defendant *shall receive* the rent. This is taking a man's property against his consent. To give the complainant the slightest equity, there must be an inconsistency between the erection of a railway and a tenancy from year to year. But these railways are but the mere tools of a ship-builder, like the *vat* of the soap-maker, the *spring-house* of the gardener, the *steam-engine* of the miner, that may be put upon the land at the tenant's risk. There is then no case made by the bill. He asks the court upon the

simple fact that he put up the railways to imply a contract, but he did this with his eyes open, knowing his title, and if he had put up an *Astor House* on the lots, he could not successfully ask the court to aid him.

But proof has been taken. This is valuable only so far as connected with the showing of the bill; it is clear that a new case cannot be made out. Now how far does the testimony corroborate the bill? does it show a contract, express or implied, under which the railways were built? The assent of West was not necessary to the structure, for it was also put over the streets over which West had no control whatever. This fact is potent against the equity of the bill as to the question of *assent*. But a railway was built in 1835, of which there is no testimony of assent,—it was built merely under a lease from year to year, with no agreement, express or implied, as to its continuance. There is again no testimony of West's assent to the road of 1842. As to that of 1846 the testimony is, that West, in 1844, refused to give a lease when pressed to give one. There is nothing like a contract.

But suppose I am wrong in this, and that there is a contract, what is it? Vague and uncertain,—not such as equity will enforce. It wants mutuality—it wants a limit as to time— it wants a stipulation as to rent. It is not mutual, because there is no obligation upon Flannagan to keep the roads in repair. 4 *Gill*, 476, 477. 7 *Gill*, 124, *Tyson vs. Watts*. 2 *Md. Ch. Decisions*, 404. It has no limit as to time, because the roads may be kept in repair indefinitely. 2 *Md. Ch. Decisions*, 534. It contains no stipulations for rent, and this is an objection. 26 *Wendell*, 55, *Diffield vs. Whitlock*. Again, the contract must be clear, definite and unequivocal. 2 *Story's Eq.*, sec. 764. 4 *Gill*, 477, *Geiger vs. Green*. 2 *Md. Ch. Decisions*, 534. 4 *Sandford*, 95. The court must make a contract here to get at anything tangible, but this they cannot do; they cannot interfere to make a contract for the parties. 7 *Gill*, 499, *Emory vs. Owings*. 2 *Story's Eq.*, sec. 764. 65 *Law Lib.*, 45, 62. 26 *Wendell*, 55.

But suppose there is a contract certain and definite, it is

still a parol contract, and therefore void under the statute of frauds. A license coupled with an interest in land can only be created by deed. 13 *Mees. and Wels.*, 837, *and note by Editor*, though not so as to a license not coupled with an interest in land. 11 *Eng. C. L. Rep.*, 207. A parol license to do an act on the land of another, which may affect the owner in the use of the land, is within the statute and void. 5 *Barbour's S. C. Rep.*, 379, *Houghtaling vs. Houghtaling.* See also 4 *Sandford*, 72. 6 *Hill*, 63. 1 *G. & J.*, 377, *Hays vs. Richardson.* Possession by a tenant who was in possession at the time of the contract, will not be considered a part performance. 65 *Law Lib.*, 524.

*J. Mason Campbell* for the appellee.

There is no evidence in the record that the streets over which the railways were built, are upon the plot of the city, but it is proved that they have never been opened, and as far as the railways extend, the land on both sides is occupied either by *West* or *Flannagan*, the only parties authorised to open them.

These railways cost at least $16,000. If removed, the materials would be worth little or nothing, not more than $2000. The destruction therefore is a total one if West at once exercises his legal rights, and the question is, whether such a destruction will be permitted by a court of equity? This depends upon the case made by the bill and evidence. The equity of the bill is, that the roads were constructed by the leave and license of West, with his knowledge, approbation, acquiescence and permission. The answer admits knowledge, approbation and acquiescence, but denies that they constitute a leave or license. This is the question between us. The evidence shows that West resided in the immediate vicinity of the lots, was cognizant of every thing done upon them, was actually upon the spot looking at what was going on, critically examining the work and expressing his approbation of it. His *knowledge* then was complete. His *approbation* is equally full, for he told Flannagan *to spend*

*on,* that he should *not be disturbed* and to *confide in him.* The bill charges that he furnished a part of the materials, which is not denied by the answer, and on this motion is therefore to be taken as true. This *acquiescence* is also fully proved; the existing roads were built not upon terms, as was the case with the original one, but upon a simple *acquiescence,* as full and complete as words could make it. Is it to be supposed that Flannagan would have incurred this immense expenditure with no assurances? Such an assumption would be monstrous; but the facts of the case, upon bill, answer and evidence, are conclusive upon this subject.

Now, upon such a case as this, where heavy expenditures are made on the land of another with the latter's consent, what is the rule in equity? It is well settled, that without any contract between the parties, equity will not permit the owner of land to lie by and see another improve upon it, and then deal with his property to the improver's injury as if the improver were a wrong doer. 8 *G. & J.,* 108. 2 *White and Tudor's Eq. Cases,* 87, *Earl of Oxford's case.* 2 *Eq. Cases Abr.,* 522. 5 *Ves.,* 690, *Jackson vs. Cator.* 31 *Eng. Ch. Rep.,* 304. *Powell vs. Thomas.* And this principle applies to cases where the expenditure is made by a tenant from year to year. 7 *Ves.,* 231, *Dann vs. Spurrier.* 12 *Ves.,* 78, *Pilling vs. Armitage,* 7 *Eng. Law and Eq. Rep.,* 212, *The Rockdale Canal Co. vs. King.* 23 *Eng. Ch. Rep.,* 26, *Sutherland vs. Briggs.* Nor is this interference of equity obnoxious to the criticism that the statute of frauds must be violated to allow it, for, independently of the acts of part performance proved in this case, it is now settled in this country, that a right of property may exist in a permanent structure erected by one man on the land of another, apart from any interest or estate in the land itself. Equity, under such circumstances, will protect the licensee in the use of what he has acquired by his license, on the ground that he is a purchaser for a valuable consideration, and entitled to what he has paid for. 2 *Amer. Leading Cases,* 511.

It is said on the other side that this is a bill for the *specific* performance of a contract, but this is not so, and all the cases

cited, therefore, fail to be applicable. This case comes under a different head of equity; the prayer of the bill is, that complainant is entitled to have the roads as long as they exist. It alleges that this right is about to be disturbed, and seeks to prevent this being done. A bill for specific performance always asks, that the legal title to the land on which acts of part performance are due may be decreed to the complainant. This case is different, and is like that of *White vs. Flannigain*, 1 *Md. Rep.*, 525. We ask that our equitable rights may not be interfered with. This raises the question, whether one may not have a recognised right of property in a structure erected on the land of another? 2 *Amer. Leading Cases*, 524. It is upon this theory that the bill was filed, and it has nothing to do with specific performance. But if this position of specific performance were insisted upon, the cases are not altogether with the appellant. 2 *Story's Eq.*, sec. 798. This is a contract which cannot be specifically performed, and where equity will give the innocent expender the expenditures he has incurred.

As to the question of license, the case in 13 *Mees. and Wels.*, 855, *note and cases there cited*, shows that the case of *Leadbitter vs. Wood*, is not altogether unquestioned, but has been considerably qualified by the decisions in this country. There are certain licenses which cannot be revoked without tender to the licensee of all the money he has expended under the license. The case followed in this State is 8 *East*, 308, *Winter vs. Brockwell*. A license executed is not countermandable. 2 *Gill*, 227, *Addison vs. Hack*, adopts the case of *Winter vs. Brockwell*. The statute of frauds in such cases does not apply. The difference between a license when set up in a court of law or in a court of equity, has been decided in this country in the case in 14 *Searg. and Rawle*, 267. See also 4 *Searg. and Rawle*, 241, *Le Fevre vs. Le Fevre*. We claim by virtue of a license from West, under which we have made heavy expeditures, and we say that in equity we are free from the statute of frauds—the license is irrevocable, and its revocation would act as a direct fraud.

· *Reverdy Johnson* on the same side.

There are two points presented by the appellants, which are sufficiently distinct to argue the whole case upon. The first is, that the appellee has presented no case by his bill; and the second, that if he has a case as by his bill, it is denied by the answer and disproved by the evidence.

1st. Has the appellee made a case by the bill entitling him to the relief asked, or any thing like the relief asked? The bill alleges that the complainant, who was a ship-builder, erected the railways at great expense, and the loss cast upon him, if now forced to take them away, will be the difference between $2000 and $16,000; that these ways were made with the knowledge and approbation of the defendant—that he furnished part of the materials; that they would not have been made and the expense incurred, had the party making them supposed they would be liable to be removed; that complainant had obtained a right of *property in the structures* thus erected; that he and West well knew that the expense would not have been incurred except upon the faith that they would not be disturbed so long as they should last. The case then is that of a tenant from year to year making expenditures to the extent of $16,000 with the consent of the landlord, which he would not have made except upon the faith that he would not be compelled to remove them so long as they would be fit for use. The prayer of the bill is, that he may be quieted in the possession and enjoyment of this right. The question then is, whether this case thus presented is not one for equitable relief in the manner proposed by the bill?

2nd. Supposing the bill presents a case, it is said it is denied by the answer and evidence. But the answer admits every thing except that there was any assurance that the ways should continue, and there is no proof on the part of the defendant negativing the case made by the bill. The only proof on his side is, that from time to time he refused to give a lease different from that of one from year to year;—there is no proof that West ever notified the complainant that he designed to take away from him the use of the roads. He was

West *vs.* Flannagan.

told to spend on, you shan't be disturbed, everything shall be settled in an amicable way or to your satisfaction; that he should not be disturbed; that West would not remove him to give the lots to any one else for a ship yard at any price. This evidence shows that Flannagan would not have made this expenditure except for the assurances thus given. The entire value of the structure was in its use *there,* upon the spot where it was erected. He would have been a madman to have engaged in such an expense, except upon assurances that he would not be disturbed. West must also have known that Flannagan would not so have expended his money without such assurance.

Now as to the law: Is not this a case for the interposition of equity? Why is it not? First, it is said, because the acquiescence is not in conflict with the right of the landlord,—that the lessee had the right to erect the structure there as tenant from year to year. But this is not the question here—this is not the whole case. The question is, *did* he erect the structure and expend his money simply *as tenant?* As tenant he could have built a *palace* or paved it with *gold,* and if he did so simply *as tenant,* he must bear the loss when turned out; but if he built the palace or laid the pavement with the assurance that he should have the use of them, then a question of *good faith* arises. Where a party stands by and sees another spending his money under the belief that the title is in him, it is a fraud for the party afterwards to dispossess him. This is a general principle, and covers every variety of case where one expends money supposing he has the right to hold and enjoy the fruits of his labor. 1 *Md. Rep.,* 475, *Hoffman vs. Smith.* It applies *a fortiori* here, where the expenditure was made upon the faith and express assurance that he should have the benefit of his expenditure. Mere *silence* will estop a party, and if the omission to speak will create an equitable estoppel *a fortiori* will such estoppel be created in a case where there is an actual speaking, inducing the party to make the expenditure upon the promise that he would have the benefit of it? Suppose West had said when applied to, "I

cannot give a lease, but go on and spend your money, you shall not be disturbed," and Flannagan had gone on to do so, and West had turned round and said, "I have caught the man, and as soon as he puts the railway down I will turn him out," would not this be a case of *actual* fraud?

Is it true that such a contract as this is not protected in equity because of the statute of frauds? I say not. 3 *Kent,* 452, *(5th Ed.)* 2 *Gill,* 224, 226, *Addison vs. Hack.* 1 *Story's Eq.,* sec. 338. 31 *Eng. Ch. Rep.,* 300, *Powell vs. Thomas.* 23 *Eng. Ch. Rep.,* 26, *Sutherland vs. Briggs.* 13 *Mees. and Wels.,* 855, *and note.* The case of *Dann vs. Spurrier,* 7 *Ves.,* 231, covers the case at bar and has never been questioned—not a doubt has ever been cast upon it.

Will not the court interfere by injunction? We have made out such a case as *Lord Eldon,* in 7 *Ves.,* 231, says would entitle the party to relief upon final decree. The agreement set up here is, that we are to have the railway as long as it lasts. How are we to have it? Either at the present rent or a different one. If West had designed to charge more, he ought to have told us so. It is not a bill for a specific execution, but we ask to be quieted in the possession of this structure which we have put upon his lot, and under assurances that we should not be disturbed in the use of it.

*John V. L. McMahon* for the appellant, in reply.

There is no difference between us as to the point that the injunction must be dissolved, unless the case made by the bill shows such an agreement as the court could or would, at final hearing, enforce by the decree. The cases cited (4 *Gill,* 475, 477. 2 *Md. Ch. Decisions,* 534,) fully sustain it. The injunction is always ancillary to some right, either legal or equitable.

The tenancy from year to year is by consent ended; we have given him notice to quit, and upon his own showing, the old tenancy ceased the moment he put up the railways. He alleges, as a substitute for the tenancy from year to year, that a prolonged tenancy was created. The right which he

West vs. Flannagan.

claims is not a license, it is a claim for a lease—he asks for possession of land upon the payment of a rent, and this, as all the books say, is a lease.    What is the duration of this interest?  he asks to keep the railway as long as it lasts, *at least* for twenty years,—it is for an uncertain period, and this brings it within the statute of frauds.    11 *Eng. C. L. Rep.*, 207.    The rent is not fixed and the court is to fix it, and there is to be a sliding scale to be adjusted by the court who is to be the landlord.    It is not pretended that this is a legal claim; the bill asserts it to be an equitable one.    But if this right is claimed by any contract, either express or implied, it is clearly within the statute, for it is a claim of an interest in lands for at least twenty years.    The claim to the exclusive use of land, and to keep the owner out is an estate or interest in land. 11 *Eng. C. L. Rep.*, 207.    13 *Mees. and Wels.*, 837.    It is such as cannot pass by any parol contract.    It is claimed upon the ground of fraud or upon an acquiescence, which would amount to fraud.    Upon the ground of fraud the case cannot be made out, except upon some contract, or some negotiation or treaty upon which the party was induced to act.

The bill does not state that there was any assurance from West of any other title.    He alleges, as his only title, that he was in as tenant from year to year.    His equity is that being thus in, he went on and put down fixtures in the way of his trade, with the consent of his landlord and his approbation. This is the bill upon which an injunction is asked.    How useless the discussion upon the question of fixtures, which may be removed, if the tenant can have the right to stay with them as long as they last! !

The cases cited on the other side all go upon the ground of mistake as to title, and forfeiture of title by reason of some secret lien or trust, which was unknown to the party making the expenditure.    But this is a case of open title, known to both parties—they are bound to know it.    *Young vs, Frost,* 1 *Md. Rep.*, 377.    *Casey vs. Inloes,* 1 *Gill,* 430.

But the expenditures here made are not of a character to raise an equity—they are not for the benefit of the land.    4

*Sandford,* 92, 94, and the case in 12 *Ves.,* 84, *Pilling vs. Ar-mitage,* cited on the other side.   The case in 7 *Ves.,* 231, was the case of a written agreement for a lease, and there was a mistake upon the construction of it, and the party then asked for a specific performance of the alleged agreement.   The case in 23 *Eng. Ch. Rep.,* 32, is one for the specific perform-ance of an agreement to give a lease for a specific duration.

There is no such principle as this bill seeks to set up, that equity will decree a lease to a tenant under such circumstances as these, uncoupled with any allegation of mistake as to title. The ground of fraud therefore fails.   If you acted upon the theory of fraud, how would you decree this lease?   You can-not do it without some agreement, or contract, or treaty, for a lease.

But upon the answer what doubt can there be?   The whole ground of the bill is upon the silence of West, not upon any promise or assurance on his part that he would not disturb the complainant.   The answer explicitly denies any such as-surance, and on the contrary avers, that he told Flannagan that he would remove them whenever he wanted to improve the lots.   If there was a shadow of equity in the bill, the answer has denied it, and standing upon bill and answer, before the act of 1835, ch. 380, the answer must preponderate. That act gave the right to take testimony in support of the bill.   If the answer is to be looked to, there is an end of the case, whether the evidence is in or out.   Flannagan does not say in his bill that he made these roads upon any assurance or promise on the part of West.   If there was any such pro-mise, he had every inducement to put it in his bill.   He had $16,000 at stake, yet he fails to pledge his conscience to any such promise.

The improvements were not for the amelioration of the estate.   We do not want to take the fruits of his labor,—we want it away—it is a great inconvenience to us,—our ware-houses are obstructed whenever there is a ship on the ways.

The evidence relied on is suspicious—he failed to make the averment in the bill—but what is it?   It shows that the

work was not *commenced* upon the faith of such assurances— the witness says the work was *going on* when the conversation was held. The only assurance ever given was, that West would not let anybody else have the lots for *a ship-yard* at any price.

There is no agreement shown which a court of equity will execute, and if any, it is wanting in the essential element, of the rent to be paid, uncertain as to the duration of the term or interest claimed, and is wanting in mutuality. 7 *Gill*, 124, 130, 155, 156, 449. 4 *Sandford*, 95. 2 *Story's Eq., secs.* 763 *to* 767. 65 *Law Lib.*, 524, 525. 1 *Gill*, 383. 26 *Wendell*, 55. 2 *Md. Ch. Decisions*, 404, 405, 538. 1 *Do.*, 348, 349. 4 *Gill*, 477. 3 *Md. Rep.*, 480, *Young vs. The Ches. and Ohio Canal Co.*

There must be proof of the identical contract. There is no contract alleged by the bill or proved by the evidence. But suppose there was, there is nothing to take it out of the statute of frauds. There is no allegation of acts of part performance or proof of them. His possession was under the contract of lease from year to year, and he had the right to put the road down under this title. There must be mutuality. What right have we to make Flannagan stay there a single day? Mutuality must be determined by the contract itself, not by what occurs subsequently. Suppose we had gone into court and asked for a decree requiring *Flannagan* to stay there! it is needless to state the result.

That the right claimed by the appellee is such an interest in lands as could not, either under the statute of frauds or our registry acts be created by mere parol agreement or license, and especially not by any mere *implied* lease or license, see 11 *Eng. C. L. Rep.*, 207, 209, 212. 13 *Mees. and Wels.*, 837. 15 *Wendell*, 380, 392, 393. 6 *Hill*, 61. 5 *Barbour's S. C. Rep.*, 379, 383, 384. 4 *Sandford*, 72. 1 *G. & J.*, 377 to 385. 2 *Gill*, 228, 229.

That there can be no *implication* of such an interest in lands or of an agreement to give it, from the mere fact of the expenditures on the appellant's property, with his knowledge

and without objection, the appellee knowing the appellant's title as well as his own, and confessedly holding the premises and entitled to the occupation and use of them as tenant from year to year, see 1 *Gill*, 401, 402. 1 *Md. Rep.*, 400, 490. Upon the whole then we insist:

1st. That the case made by the bill presents no equity entitling the complainant to the injunction. Its equity is grounded on the allegation that the appellee, or his predecessors, whilst confessedly but lessees from year to year of the premises, put down the railways at a large cost to them, for the purposes of their trade and business as ship-builders : that said railways were so put down, with the knowledge, approbation and acquiescence of the appellant, and his implied leave or license thereby : and that they would not have been put down if they had supposed there was any probability of their removal whilst fit for use, and that West never gave them any reason to suppose that they would be so removed. And it is maintained for the appellant—that the appellee and his predecessors, confessedly holding said premises under the appellant as his tenants from year to year, and having the right to put the structures there for the purposes of their trade, could not and did not, by the making of such structures and their expenditures thereby, acquire any right as against their lessor (the appellant) to keep possession of said leased premises after their said lease was *duly* ended, even if said railways were put down with the knowledge, approbation and acquiescence of the appellant, and the appellant gave them no reason to suppose they would be liable to removal—that the title to the premises claimed by the bill, and as ancillary to which the injunction is prayed and granted, is the right, as lessees of the appellant, to keep the premises after the expiration of their tenancy from year to year, and so long as said railways can be kept up and fit for use by repairs, subject to the payment of a reasonable rent, which, they admit, may be raised from time to time as the lots appreciate in value : that the bill does not allege or show any agreement on the part of the appellant to give any such

title, or any lease or agreement for it except the tenancy from year to year: and that even if it had been so alleged or shown, it could give the appellee no title to the premises, after the tenancy from year to year was duly ended by the notice, nor any right to the injunction granted.

2nd. That the equity of the bill, if there was any, is removed by the averments of the answer responsive to it: and that the evidence taken, to support the allegations of the bill, does not help the case, or entitle the appellee to the continuance of the injunction.

Mason, J., delivered the opinion of this court.

The alleged equities of the present bill consist in the averments that the complainant as tenant of the defendant had made certain marine railways, at a heavy expense, upon the demised premises; that "the construction of said railways took place with the knowledge and approbation and acquiescence, and by the implied leave and license of the said West, whose office was hard by all the time, and who was frequently present during their construction, and furnished materials for the machine with which the piles were cut, and expressed his approval of the manner in which the work was done; and that said railways would not have been made if the parties making them had supposed there was any probability of their removal while fit for use, and that said West during their construction never gave their makers any reason to suppose that they would be so removed;" and that "it is well known to said West, that your orator and those concerned would never have encountered the expenses of their construction, but upon the faith that they would be permitted to use them, so long as they were fit for use;" and then complains, "that notwithstanding the premises, the said West has given him notice to quit," &c.

It is admitted by the complainant in his bill, that he and his predecessors held the property of the defendants, under *a lease from year to year;* and it is also admitted and proved,

that he repeatedly requested West to give him a more perma-
nent lease, and that West as often refused.

From such a state of facts we cannot recognise any equi-
ties entitling the complainant to the injunction prayed for in
his bill.

The defendant on the one hand relies upon the *express* con-
tract between himself and the complainant, that the latter
should hold and enjoy the property as tenant from year to
year, as the rule by which their respective rights, in the pre-
sent transaction are to be governed; while the complainant
sets up an implied agreement or license creating rights wholly
inconsistent with those existing under the express contract
or lease.

The terms of the lease or contract are expressly established
by the admissions of both parties; while the facts, out of
which grows the alleged *implied* contract or license, are de-
nied by the defendant, and are far from being satisfactorily
established by the evidence.

As a general rule implied contracts are only sustained in
order to supply the place of express agreements, and we know
of no case where the latter have been made to yield to the
former unless by the express or implied understanding of the
parties that such should be the result. Indeed an express
agreement, admitted to be, as this one is, in full force, nega-
tives an implied, inconsistent agreement, relating to the same
subject matter. Therefore conceding that there was no dis-
pute about the facts charged in the bill, and out of which the
implication of a contract or license might under other cir-
cumstances arise in the absence of an express contract, yet,
we can discover no reasons why the general rule should be
departed from, in the present instance, and the implied con-
tract substituted in the place of the one expressly established
and still recognised as continuing, up to the time of filing
the bill.

The lease from year to year being established and recog-
nised by both parties, they are in law supposed to know the
nature and incidents of such a tenancy. The improvements

West *vs*. Flannagan.

made by the complainant and permitted and sanctioned by the defendant, are in perfect consistency with the terms of the lease under which the former was enjoying the property, and, therefore, no other implication of a contract or license is necessary as a justification or authority for the conduct of the complainant in making those improvements, than is to be drawn from the lease itself. He must be presumed to have been acting under and by virtue of the lease, and with his eyes open as to the rights and powers conferred by that lease, upon both himself and the defendant; and " the knowledge, approbation and acquiescence, and the implied leave and license" of the defendant, could have had no more to do with enlarging the rights of the complainant under the lease, than an opposite course would have had in curtailing them.

Such then is the case as made by the bill. But admitting *et gratia argumenti,* that the allegations of the bill do actually disclose equities in favor of the complainant, how are those equities affected by the subsequent proceedings in the case?

In the first place the answer swears away every substantial equitable allegation made by the bill, and if the case stood alone upon bill and answer the complainant would be out of court. But it is contended that the force of the answer is broken, and the averments of the bill established by the proof in the cause. Is this true? The force of an answer, responsive to the bill, can only be avoided by the contradicting testimony of two witnesses, or by the testimony of one, supported by pregnant circumstances. The complainant's witnesses do not sufficiently concur in their statements so as to destroy the weight of the answer taken in connection with the defendant's proof. As to the circumstances developed in the progress of the trial, so far from being *pregnant* with support of complainant's case, they in fact mainly tend to sustain the truth of the answer. The anxiety of the complainant to obtain a more permanent lease than the subsisting one, and the refusal of the defendant to grant it, are facts almost conclusive that the defendant did not intend to surrender the rights he held under the then ex-

8      v.4

isting lease, one of which was the right to terminate the tenancy at the end of any one year. And admitting what the witnesses say to be undenied, that the defendant said, *complainant must confide in him*, and that *he would not disturb him in the use of the roads, and that they were built upon the faith that the defendant would not interfere with him, &c.*, and that all this evidence supported the averments of the bill; still the demand at this time by the defendant to be restored to the possession of his property, would not be in conflict with the obligations imposed upon him by such promises and assurances. How long was the complainant, under the above assurances, to remain undisturbed in the enjoyment and use of the defendant's property? For two, four, or seven years? If so, the pledged faith of the defendant was not violated. The first railway was used for more than ten, the other for more than seven years. But it is said the obligation is, to allow the complainant to enjoy the road as long as it lasts, or is fit for use. Is then the first defect or break in the road, requiring repair or renewal, to amount to a forfeiture or termination of the complainant's rights? Clearly not, we presume, for this doubtless repeatedly occurred during the period in which he was undisturbed in the use of the roads: for one of the witnesses says "these railways require constant repair and watchfulness to keep them in working order." If these repairs are once allowed when and where are they to end? The same witness says, and no doubt truthfully, "by constantly renewing the defective parts, the railway might be kept fit for use for an indefinite time." Thus the license would become perpetual. Such an interest *in realty*, little less than a fee-simple estate, could hardly be supposed to rest upon so flimsy a basis as the one set up by the complainant.

A striking peculiarity of this case is to be found in the circumstance that the complainant has *proved* a better case than he has made in his bill. If the conduct of the defendant as shown by the witnesses had induced the faith upon which the complainant acted, is it not singular that at the time he filed his bill that conduct did not occur to him so that he might

have averred it? The equity alleged to be raised by the proof, consists in the fact, assumed to have been proved, that the railways were made upon the faith that the defendant would permit the complainant to use them as long as they were fit for use. The evidence establishes no such fact, so far from showing that these improvements were made upon the faith of the acts and conversations of the defendant, the proof is express that those acts and conversations took place after one of the roads had been completed, and while the other was in progress of construction.

Upon the whole we regard the doctrine contended for by the appellee on the present appeal, as fraught with the most serious and dangerous consequences, and we cannot see that it is sustained by any sound principle, or well adjudicated decision. It amounts virtually to the assertion of the right in this court under certain circumstances, to condemn the property of one individual, against his will, for the private beneficial purposes of another.

The views already expressed will render unnecessary any opinion upon the subject of the operation of the statute of frauds upon the present transaction.

The decree in the present case, which was a *pro forma* decree continuing the injunction, must be reversed.

*Decree reversed, injunction dissolved and bill dismissed with costs to the defendant, in both courts.*